UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - x
                                          :
UNITED STATES OF AMERICA                  :
                                          :
          -v.-                            :
                                          :    **SEALED INDICTMENT**
JULIUS CSURGO,                            :
   a/k/a "Gyula Karoly Csurgo," and       :    22 Cr.
ANTHONY KORCULANIC,                       :
   a/k/a "Remy,"
   a/k/a "Viper,"                         **22 CRIM 190**
                                          :
          Defendants.                     :
                                          :
- - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

     The Grand Jury charges:

### Overview

     1.   From at least in or about 2015, up to and including at
least in or about 2019, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo,"
and  ANTHONY  KORCULANIC,  a/k/a  "Remy,"  a/k/a  "Viper,"  the
defendants,  and  others  known  and  unknown  (collectively,  the
"Group"),  conspired  to  defraud  the  investing  public  by
orchestrating  and  facilitating  multiple  "pump-and-dump"  stock
manipulation  schemes.   During the conspiracy, the members of the
Group orchestrated "pump-and-dump" stock manipulation schemes in
connection  with  the  securities  of  at  least  approximately  19
issuers.

2.   As a result of these pump-and-dump schemes, JULIUS
CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a
"Remy," a/k/a "Viper," the defendants, and their co-conspirators
collectively generated at least approximately $35 million in total
proceeds.

## Relevant Individuals and Entities

3.   At all times relevant to this Indictment, JULIUS CSURGO,
a/k/a "Gyula Karoly Csurgo," the defendant, was a dual citizen of
Canada and Hungary who resided in Canada.  As is described herein,
CSURGO orchestrated numerous "pump-and-dump" stock manipulation
schemes.  CSURGO owned and operated Antevorta Capital Partners,
Ltd. ("Antevorta") which he used as a vehicle for these "pump-and-
dump" manipulation schemes. Among other things, CSURGO directly
and through Antevorta, bought and sold numerous stocks in
connection with the scheme and funded certain fraudulent
promotional campaigns used to drive up share prices as the members
of the Group then sold off shares of certain issuers.

4.   At all times relevant to this Indictment, ANTHONY
KORCULANIC, a/k/a "Remy," a/k/a "Viper,", the defendant, was a
dual citizen of Canada and Croatia who resided, at certain relevant
times, in Spain.  As is described herein, KORCULANIC participated
in multiple "pump-and-dump" stock manipulation schemes including
by, among other things, coordinating stock promotion campaigns and

by providing funding in furtherance of the stock manipulation schemes and coordinating trading in connection with these schemes.

5.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-1"), was a citizen of the United Kingdom and Switzerland who resided in Switzerland. CC-1 was a founder and co-principal of a firm based in Switzerland that purported to offer asset management and trustee services to its clients ("Swiss Firm-1").  CC-1 and Swiss Firm-1 participated in the "pump-and-dump" stock manipulation schemes by, among other things, executing trades at the Group's direction in brokerage accounts Swiss Firm-1 had established on behalf of various nominee entities in furtherance of the stock manipulation schemes and by then using bank accounts Swiss Firm-1 had established on behalf of these nominee entities to funnel the proceeds of these schemes to the members of the Group.

6.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-2") was a citizen of Denmark who resided in Monaco.  CC-2 participated in the "pump-and-dump" stock manipulation schemes by, among other things, providing the Group with control of certain publicly traded shell entities that were thereafter used as vehicles for the "pump-and-dump" stock manipulation schemes.

7.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-3") was a citizen

of Canada who resided in the Bahamas. CC-3 participated in the stock manipulation schemes by, among other things, coordinating promotional campaigns that, at times, caused materially false and misleading information to be distributed to the investing public for the purpose of inflating the share price and trading volume of an issuer's shares.

8.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-4") was a citizen of Canada and Croatia who resided in Canada. CC-4 controlled a network of nominee entities based in Asia (the "Asian Nominee Platform") that, among other things, executed trades at the Group's direction in furtherance of the stock manipulation schemes and then funneled the proceeds of these schemes to the Group.

9.   At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-5") was a citizen of the United Kingdom who resided in France. CC-5 owned and operated a firm based in Switzerland that purported to offer asset management and trustee services to its clients ("Swiss Firm-2"). CC-5 and Swiss Firm-2 participated in the "pump-and-dump" stock manipulation schemes by, among other things, executing trades at the Group's direction in accounts held by various nominee entities Swiss Firm-2 had established in furtherance of the stock manipulation schemes and then funneling the proceeds of these schemes to the Group.

10. At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-6") was a citizen of Canada who resided in the Cayman Islands. CC-6 was a stock broker who participated in the pump-and-dump schemes described herein by, among other things, executing trades and providing trading instructions to, among other firms, Swiss Firm-1 and Swiss Firm-2 at the direction of the Group, moving large blocks of shares at the direction of the Group, and causing the transfer of trading proceeds to the Group.

## Relevant Publicly Traded Companies

11. At all times relevant to this Indictment, Company-1 was a publicly traded company incorporated in Florida. At certain times relevant to this Indictment, Company-1 purported to have its principal offices in Nevada, and purported to be a digital currency and Blockchain technology company. At all times relevant to this Indictment, shares of Company-1 traded on the over-the-counter ("OTC") market in the United States.

12. At all times relevant to this Indictment, Company-2 was a publicly traded company incorporated in Nevada. At certain times relevant to this Indictment, Company-2 purported to have its principal offices in Manhattan, New York, and purported to be engaged in the development of treatments for insomnia. At all times relevant to this Indictment, shares of Company-2 traded on the OTC market in the United States.

13.  At all times relevant to this Indictment, Company-3 was a publicly traded company incorporated in Nevada.  At certain times relevant to this Indictment, Company-3 purported to have its principal offices in California and purported to be engaged in developing a drone-based home security and surveillance system. At all times relevant to this Indictment, shares of Company-3 traded on the OTC market in the United States.

14.  At all times relevant to this Indictment, Company-4 was a publicly traded company incorporated in Nevada.  At certain times relevant to this Indictment, Company-4 purported to have its principal offices in Valencia, Spain, and purported to be engaged in developing medical diagnostic equipment.  At all times relevant to this Indictment, shares of Company-4 traded on the OTC market in the United States.

15.  At all times relevant to this Indictment, Company-5 was a publicly traded company incorporated in Delaware.  At certain times relevant to this Indictment, Company-5 purported to have its principal offices in Utah and purported to be engaged in the development and marketing of proprietary products for the oil and gas and agriculture industries.  At all times relevant to this Indictment, shares of Company-5 traded on the OTC market in the United States.

### Overview of the Stock Manipulation Scheme

16.  From at least in or about 2015, up to and including at least in or about 2019, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, conspired to conduct "pump-and-dump" stock manipulation schemes with respect to the stock of numerous issuers.

17.  To perpetrate these "pump-and-dump" stock manipulation schemes, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, (1) secretly amassed control of the vast majority of the stock of certain publicly traded companies; (2) then manipulated the price and trading volume for these stocks, causing the share price and trading volume to become artificially inflated, and ran fraudulent promotional campaigns to further inflate the price and trading volume for these stocks; and (3) finally, sold out of their secretly-amassed positions at these inflated values at the expense of the investing public.

### The Group's Control of The Publicly Traded Shell Companies

18.  In many instances, members of the Group purchased control of a publicly traded shell company from a "shell broker" and obtained control of substantially all of the shares of the publicly traded shell company whose share price they ultimately intended to manipulate in connection with the "pump-and-dump"

scheme.  These publicly traded shell companies frequently had few, if any, actual assets or actual business operations.  The shares of these publicly traded shell companies were frequently in the form of physical share certificates issued in the names of various nominee individuals and entities.  Despite the fact that, on paper, these shares were owned by other individuals and entities, in actuality, members of the Group controlled the disposition of these shares

## The Defendants' Receipt of Large Blocks of Shares in Connection with the Pump-and-Dump

19.    In many instances during the conspiracy, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, as well as CC-3, acted in furtherance of the pump-and-dump scheme by coordinating and conducting fraudulent stock promotion campaigns in order to artificially inflate the company's share price and trading volume. In this regard, CSURGO, KORCULANIC, and CC-3 would frequently require that CSURGO's entity, Antevorta, be allocated a large block of shares of the issuer whose shares the Group was planning to manipulate prior to their commencing the fraudulent stock promotion campaign.  CSURGO, KORCULANIC, and CC-3 would, thereafter, sell all or substantially all of the shares that they had been allocated in connection with the "dump" and reap large profits.

20.  In connection with the transfer of the shares to Antevorta, share purchase agreements were typically prepared reflecting that Antevorta, which was receiving the shares from the transferor, was paying consideration for receiving the shares. In truth and in fact, because the Group already controlled these shares prior to the purported share transfer and was simply transferring the shares to Antevorta as compensation for the participation of JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, as well as CC-3 in the pump-and-dump conspiracy, the share purchase agreements were phony and no consideration was typically paid by Antevorta or the defendants to obtain the shares.  At other times, Antevorta would pay a nominal amount of consideration that was vastly discounted from the actual value of the shares being transferred, simply to have a paper trail to justify the sale. CSURGO signed numerous fraudulent stock purchase agreements reflecting that Antevorta was paying for the large blocks of shares it was receiving when, in truth and in fact, Antevorta had not paid any consideration for these shares.

21.  In the typical course, the stock positions controlled by JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, through Antevorta, were only a portion of the shares that the Group had under its control at the time the pump-and-dump commenced.  The

Group typically allocated the shares that they controlled such that each of the nominee entities subject to the Group's control generally held less than five percent of the relevant issuer's shares. The shares were allocated in this manner in order to avoid disclosure obligations under the relevant federal securities laws and regulations and to circumvent brokers' compliance protocols.

22. Thus, while on paper the shares held by JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, through Antevorta, appeared to be their own separate stock position, in reality these shares were part of a large control group that held shares across numerous platforms and nominee entities. Holding the shares through their network of nominee entities allowed the Group to conceal the fact that they controlled the disposition of the vast majority of the shares of the issuer. This allowed members of the Group to maximize their profits and avoid inquiry related to brokers' compliance protocols and disclosure obligations under the relevant federal securities laws and regulations.

## The Defendants' Control of the Companies

23. The securities that JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, sought to manipulate were issued by small companies, were thinly traded, and typically

traded at less than $2 per share.   Thus, these securities were particularly susceptible to manipulation.

24.   Members of the Group frequently installed management at the companies whose shares they sought to manipulate.   While on paper the defendants and their-conspirators had no connection to these companies, in reality they exercised substantial control, which included financing the companies' operations and funding payments for attorneys in order to prepare public filings with OTC Markets Group, Inc. and the Securities and Exchange Commission (the "SEC") in order to ensure these companies' filings were updated prior to commencing the manipulation of these companies' shares.

25.   In order to attract investor interest, the Group at times caused private businesses to be merged or "vended" into the publicly traded shell companies.   The private businesses were often in industries likely to attract the investing public's interest.

26.   Additionally, in order to attract investor interest and persuade retail investors to purchase the stock of these companies, the Group, at times, coordinated with the management of these companies such that they issued press releases and announcements in conjunction with the stock promotions being orchestrated by the Group.   Certain of the press releases that the Group caused these companies to issue contained false and misleading statements, as well as omitted material information.

### The Stock Promotion Campaigns

27.  As part of the "pump-and-dump" stock manipulation schemes, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, financed and coordinated promotional campaigns through which promotional materials touting the stocks of the companies were distributed to the investing public.  These stock promotional materials frequently contained false and misleading claims about the issuer, as well as omitting material information, with the objective of inducing retail investors to purchase the shares of the issuer, thereby permitting the defendants and their co-conspirators to sell off their substantial positions for a profit.

28.  JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, paid for certain of these press releasements and announcements, and utilized a particular marketing company ("Agency-1"), based in New York, to conduct these promotional campaigns.  During these promotional campaigns, they did not disclose their ownership interest in the stocks being promoted and made false and misleading statements about the companies and their value as investments.

29.  With respect to many of the companies, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown,

expended hundreds of thousands of dollars on the stock promotion campaigns.

### The "Dump" and Laundering of the Scheme Proceeds

30. Having artificially inflated the share prices of the relevant issuers' stock, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, profited from the scheme by selling the shares they controlled into the market at these artificially high prices. By selling these shares while the share price was artificially inflated through their manipulative activity, the Group reaped millions of dollars in illicit profits. Once the Group had sold off their shares and ceased the stock promotion campaign and their manipulative trading tactics, the share price typically quickly dropped precipitously.

31. By manipulating the stock of Companies-1 through -5, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, generated millions of dollars in proceeds. In addition to manipulating the stock of Companies-1 through -5, CSURGO and KORCULANIC also participated in the manipulation of the stock of numerous additional issuers in connection with the conspiracy charged herein.

32. JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and

13

others known and unknown, frequently laundered the proceeds of their stock manipulation schemes with the assistance of, among other co-conspirators, CC-1 and Swiss Firm-1, and CC-2 and Swiss Firm-2. The Group caused their share of these crime proceeds to be remitted to them in a manner designed to conceal the source of the funds and/or the identity of the recipients thereof, including through wire transfers that were executed through New York, New York. For instance, the Group used fabricated invoices and/or fabricated contracts and agreements to justify wire transfers from accounts held in the names of the nominee entities that had generated crime proceeds to other bank accounts controlled by the Group. Certain of these wire transfers went through banks in New York, New York.

### Statutory Allegations

33. From at least in or about 2015, up to and including in or about 2019, in the Southern District of New York and elsewhere, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

14

34.  It was a part and an object of the conspiracy that JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ, in connection the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Overt Acts

35.  In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about December 5, 2016, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," the defendant, opened an account for Antevorta at Swiss Firm-1.

b. On or about May 11, 2017, CSURGO, on behalf of Antevorta, signed an "Exclusive Marketing Contract" with Agency-1.

c. On or about July 20, 2017, CSURGO, through Antevorta, executed a stock purchase agreement for the purchase of approximately 3.5 million shares of Company-1 from CC-6.

d. On or about July 21, 2017, CSURGO, through Antevorta, received a transfer of approximately 3.5 million shares of Company-1.

e. On or about July 26, 2017, CSURGO, through Antevorta, executed a stock purchase agreement for the purchase of approximately 3.5 million shares of Company-1.

f. Starting in or about July 2017, ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," through Antevorta, directed a promotional campaign regarding the stock of Company-1 that contained false and misleading information about Company-1.

g. On or about October 18, 2017 KORCULANIC emailed Agency-1 promotional materials about Company-1.

h. On or about April 25, 2017, CSURGO, through Antevorta, received approximately 1.3 million shares of Company-2.

16

i.   Starting in or about May 2017, CSURGO and KORCULANIC caused Antevorta to pay Agency-1 and coordinated with Agency-1 on a promotional campaign for Company-2.

j.   In or about August and September 2017, in two separate transactions, CSURGO, through Antevorta, received approximately 6.26 million shares of Company-3.

k.   Starting in or about September 2017, CSURGO and KORCULANIC caused Antevorta to pay Agency-1 and coordinated with Agency-1 on a promotional campaign for Company-3. In total, Antevorta paid Agency-1 approximately $450,000 for this campaign, which ran through on or about March 9, 2018.

l.   Between on or about September 28, 2017, and on or about January 29, 2018, CSURGO, through Antevorta, sold approximately 4.4 million shares of Company-3.

m.   In or about January and February 2017, CSURGO, through Antevorta, received approximately 1.6 million shares of Company-4.

n.   Starting in or about February 2017, CSURGO and KORCULANIC caused Antevorta to pay Agency-1 and coordinated with Ageny-1 on a promotional campaign for Company-4.   In total, Antevorta paid Agency-1 approximately $311,000 for this campaign, which ran through in or about May 2017.

o.   On or about February 10, 2017, KORCULANIC emailed CC-6 regarding the anticipated promotional campaign with Agency-

1, and told CC-6 that they needed to be ready to transact shares of Company-4 due to the upcoming campaign.

p.   In or about May 2017, members of the Group deposited approximately 10 million shares of Company-5 into Antevorta's account at Swiss Firm-1.

q.   Between in or about April and October 2017, CSURGO and KORCULANIC caused Antevorta to pay Agency-1 and coordinated with Agency-1 on a promotional campaign for Company-5.

r.   On or about October 10, 2017, CSURGO, through Antevorta, sold approximately 49,000 shares of Company-5's stock held in its brokerage account at Swiss Firm-1.

s.   On or about June 22, 2018, KORCULANIC requested the transfer of approximately $213,751 from an account he controlled at Swiss Firm-2 to a nominee account under his control.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

36.   The allegations contained in paragraphs 1 through 32, and 35 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

37.   From at least in or about 2015, up to and including in or about 2019, in the Southern District of New York, and elsewhere, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY

KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

38.  It was a part and an object of the conspiracy that JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, CSURGO, KORCULANIC, and others conspired to manipulate the share price and trading volume of various publicly traded stocks, including the shares of Company-1 through Company-5, and used the wires in connection with said conspiracy, including wires that passed through the Southern District of New York.

(Title 18, United States Code, Section 1349.)

## COUNTS THREE THROUGH SEVEN
### (Securities Fraud)

The Grand Jury further charges:

39. The allegations contained in paragraphs 1 through 32, and 35 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

40. On or about the dates set forth below, in the Southern District of New York and elsewhere, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and the mails and facilities of national securities exchanges, did use and employ, and cause to be used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, and aided and abetted the same, to wit, in or about the time periods set forth below, CSURGO and KORCULANIC

participated in a scheme to manipulate the share price and trading volume of the securities of the following companies:

| COUNT | COMPANY | TIME PERIOD |
|-------|---------|-------------|
| **THREE** | Company-1 | 2015 through September 2017 |
| **FOUR** | Company-2 | Early 2017 through July 2017 |
| **FIVE** | Company-3 | May 2017 through January 2018 |
| **SIX** | Company-4 | July 2015 through April 2017 |
| **SEVEN** | Company-5 | 2017 through February 2018 |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
and Title 18, United States Code, Section 2.)

### COUNT EIGHT
### (Wire Fraud)

The Grand Jury further charges:

41.   The allegations contained in paragraphs 1 through 32, and 35 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

42.   From at least in or about 2015, up to and including at least in or about 2019, in the Southern District of New York and elsewhere, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, willfully and knowingly, having devised

21

and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, CSURGO, KORCULANIC, and others engaged in a scheme to manipulate the share price and trading volume of the stock of Company-1 through Company-5, as well as other stocks, which scheme involved the use of wires, including wires that passed through the Southern District of New York.

(Title 18, United States Code, Section 1343 and 2.)

## COUNT NINE
**(Conspiracy to Commit Concealment Money Laundering)**

The Grand Jury further charges:

43.   The allegations contained in 1 through 32, and 35 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

44.   From at least in or about 2015, up to and including at least in or about 2019, in the Southern District of New York and elsewhere, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, knowingly combined, conspired,

22

confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1956(a)(1)(B)(i).

45.   It was a part and an object of the conspiracy that JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and unknown, knowing that the property involved in certain financial transactions, to wit, wire transfers to bank accounts controlled by the scheme participants and transfers to purchase assets for scheme participants, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), to wit, fraud in the sale of securities and wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

### FORFEITURE ALLEGATIONS

46.   As a result of committing one or more of the offenses alleged in Counts One through Eight of this Indictment, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, and others known and

23

unknown, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to, a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

47.   As a result of committing the offense alleged in Count Nine of this Indictment, JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real and personal, involved in said offenses, or any property traceable to such property, including but not limited to a sum in United States currency representing the amount of property involved in said offenses.

## Substitute Assets Provision

48.   If any of the above-described forfeitable property, as a result of any act or omission of JULIUS CSURGO, a/k/a "Gyula Karoly Csurgo," and ANTHONY KORCULANIC, a/k/a "Remy," a/k/a "Viper," the defendants:

a.   cannot be located upon the exercise of due diligence;

24

b.    has been transferred or sold to, or deposited
with, a third person;

c.    has been placed beyond the jurisdiction of the
Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which
cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), and Title 28, United States
Code, Section 2461, to seek forfeiture of any other property of
the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982; Title 21,
United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney


25

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

### - v. -

### JULIUS CSURGO,
### a/k/a "Gyula Karoly Csurgo," and
### ANTHONY KORCULANIC,
### a/k/a "Remy,"
### a/k/a "Viper,"
### Defendants.

---

### SEALED INDICTMENT

22 Cr. \_\_\_\_

(15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. §
240.10b-5; 18 U.S.C. §§ 371, 1343, 1349,
1956(h) & 2.)

---

DAMIAN WILLIAMS

United States Attorney.

**A TRUE BILL**

*Mark G. E*

FOREPERSON

---

3/29/22
NE

Sealed Indictment filed

Arrest Warrant filed

Sarah L Cave
USMJ